HAUMERSEN and wife, Respondents, vs. SLADKY and another, Appellants.

*December 5, 1935—January 7, 1936.*

For the appellants there was a brief by *Edmund O. Gilday* and *J. M. Weisman,* and oral argument by *J. M. Weisman* and *Samuel M. Weisman,* all of Racine.

For the respondents there was a brief by *Hand & Quinn* of Racine, and oral argument by *E. B. Hand.*

FRITZ, J.    It suffices for a consideration of the questions involved on the appeals herein to note, at the outset, the following facts which were established by evidence that is undisputed in many respects: On Saturday, July 7, 1934, the plaintiffs and Sladky duly entered into a contract which was drafted by Robert G. Nelson, a licensed real-estate broker, whom Sladky had engaged.    Under that contract, Sladky agreed to convey his farm, including personal property and crops, to plaintiffs in exchange for their house and lot in Racine, and five shares of certain bank stock, and their as-

sumption of a mortgage on the farm for $2,000. As earnest money, each of the parties paid $50 to Nelson, on account of the commission which Sladky contracted to pay to him. He had been endeavoring to sell Sladky's farm to plaintiffs for two weeks prior to July 7, 1934. During that period, both parties had inspected each other's property, including the personal property used in farming; and the reasonableness of the terms of the exchange, as finally embodied in their contract, is not questioned in this litigation.

The contract provided that: ". . . The deal is to be closed when abstracts are posted to date. Possession of farm given as soon as Mr. Sladky can gain possession of his Geneva street house." By July 9th, Nelson had the abstracts of title extended and delivered plaintiffs' abstract to Edmund O. Gilday, who was Sladky's attorney; and the latter's abstract to Louis F. Quinn, the attorney for plaintiffs. Under arrangements made between the parties, plaintiffs had moved five loads of their household goods to Sladky's farm by Wednesday, July 11th, and he had moved household effects to plaintiffs' city property for storage until he could occupy his Geneva street house. On July 11th, Gilday told Sladky that he had just glanced at plaintiffs' abstract and that there was a "shadow" on the title. That evening, when plaintiffs brought another load of furniture to Sladky's farm, he told them to "hold off," that they shouldn't haul any more, and that the "papers would cost too much." He was very abrupt, and then went into the house, slammed the door, and refused to talk to plaintiffs. On July 14th, they went to the farm and told Sladky's mother that they wanted to see him. She replied that he was away and that they would have to see his lawyer, Gilday. Thereafter Sladky refused to talk to plaintiffs. On July 18, 1934, Gilday wrote Sladky that in his opinion plaintiffs' title was not marketable because of six imperfections which appeared in plaintiffs' abstract; and on

July 28, 1934, they received a letter written by Gilday, on behalf of Sladky, stating that he rescinded the sale because plaintiffs' title was not merchantable by reason of those six imperfections. On July 30, 1934, E. B. Hand, as attorney for plaintiffs, tendered a warranty deed and the abstract of title to Sladky, together with a writing in which plaintiffs demanded that he perform the contract of July 7, 1934, and in which they offered to deliver the bank stock and the note and mortgage on the farm, and to correct promptly any defects in the title to plaintiffs' premises, including those mentioned in Gilday's letter received on July 28, 1934. On August 10, 1934, Sladky leased his farm to the defendant, Smerda. He had moved his household effects to his Geneva street house within a week after his tenant vacated on July 14, 1934.

On August 20, 1934, plaintiffs brought this action for specific performance. The issues were tried on January 15, 1935, but, because of the request of defendants' counsel for additional time to file briefs, the court's decision was delayed until April 26, 1935. On April 30, 1935, findings of fact and conclusions of law were filed, and on May 11, 1935, judgment was entered for specific performance, with a proviso that, if Sladky gave notice to plaintiffs that he desired to have them correct certain matters which he had claimed constituted imperfections in title, then the plaintiffs should make those corrections within fifteen days; and that, thereupon, plaintiffs could obtain an order showing that fact. Although no such notice was given by Sladky, the court, on June 28, 1935, ordered the case reopened for taking testimony in respect to the plaintiffs' correction of those imperfections, and, on July 12, 1935, adjudged that the corrections had been made by the plaintiffs pursuant to the judgment, and that the abstract of title, as extended, showed that proof of those corrections had been recorded.

On this appeal, Sladky contends that his contract with the plaintiffs was unenforceable because it was too indefinite and uncertain to comply with the statute of frauds, in that it did not specify the items of personal property which were to be conveyed by Sladky. The contract, in that respect, provides: "The trade price of said property is fifteen thousand ($15,000) dollars, which includes all personal property and crops, excepting therefrom one fat hog to be left on the premises until time to butcher, and also between twelve and eighteen hens." That provision is unambiguous on its face. Sladky claims, however, that there were household goods, two automobiles, a truck, livestock, poultry, and other items of personal property on the farm which did not belong to him, and that the parties were to agree as to what was to go with the farm, and to make an inventory and itemized bill of sale thereof, when the abstracts were posted and the transaction was consummated by an exchange of deeds. On that subject, the court found that when the plaintiffs and Sladky inspected the farm before signing the contract on July 7, 1934, Sladky pointed out the machinery, livestock, and other personal property, used in the operation thereof, which was to be included in the sale, and that the items thereof, as then pointed out by Sladky were correctly listed in an inventory prepared shortly thereafter by a witness present when Sladky pointed out those items as property which was to be included in the sale. Those findings and the court's conclusion that the contract was not so indefinite and uncertain as to be unenforceable are amply supported by the evidence. The application of the provision that the trade price "includes all personal property and crops, excepting therefrom one fat hog . . . and between twelve and eighteen hens," and the identification of the subject matter thereof, could be shown by parol evidence, as to the surrounding circumstances and situation of the parties at the time the contract was made. As

was said in *Docter v. Hellberg,* 65 Wis. 415, 421, 27 N. W. 176:

". . . The law will not declare an agreement void for uncertainty when the light which contemporaneous facts and circumstances furnish renders the description definite and certain. [Citations.]

"A description which can thus be made certain by proof of an extrinsic fact referred to in the agreement must be regarded as sufficiently certain to enforce specific performance."

In accordance therewith, this court said, in *Inglis v. Fohey,* 136 Wis. 28, 32, 116 N. W. 857:

". . . Where parties have attempted to reduce an agreement to writing, and such writing is in some respects indefinite or ambiguous, the contract does not necessarily fail, nor will a party suing upon it be denied relief. If, by aid of evidence showing the situation and surroundings of the parties at the time, and their subsequent acts, if any, construing the terms of the writing, the court can with reasonable certainty determine the meaning intended by the parties, the court will not allow the contract to fall, but will construe it in the light of such evidence and enforce its terms as so construed, if there be no other fatal objections to it. . . ."

To the same effect, see *Messer v. Oestreich,* 52 Wis. 684, 689, 10 N. W. 6; *Whitney v. Robinson,* 53 Wis. 309, 314, 10 N. W. 512; *Parkinson v. McQuaid,* 54 Wis. 473, 484, 11 N. W. 682; *Meade v. Gilfoyle,* 64 Wis. 18, 24 N. W. 413; *Combs v. Scott,* 76 Wis. 662, 673, 45 N. W. 532; *Kipp v. Laun,* 146 Wis. 591, 131 N. W. 418; *Hopfensperger v. Bruehl,* 174 Wis. 426, 183 N. W. 171; *Spence v. Frantz,* 195. Wis. 69, 217 N. W. 700; *Moayan v. Moayan,* 114 Ky. 855, 72 S. W. 33, 60 L. R. A. 415, 423; Pomeroy, Spec. Perf. (3d ed.) § 90.

Sladky further contends that the plaintiffs were not entitled to specific performance because, due to defects in their title, they could not perform the contract within a few days,

although time was intended to be of the essence of the contract, and the fact that performance was to be thus completed was established by evidence as to the surrounding facts and circumstances. In respect to that contention, it must be noted that the contract did not expressly provide that time was of the essence. Although it was stated therein that each party, "will, within the time hereinafter limited, convey or cause to be conveyed to the" other party, no period was mentioned therein as to that limitation. Likewise, although it was also provided that the "deal is to be closed when abstracts are posted to date," there was no time limitation prescribed in that respect. In their brief, Sladky's counsel recognizes that, as was said in *Hermansen v. Slatter,* 176 Wis. 426, 429, 187 N. W. 177:

"Where time is not of the essence of the contract and the thing to be done can be as well done at a later as an earlier day without detriment to the party for whom the thing is to be done, the delay will not prevent specific performance. It is the modern tendency, especially in equity, not to treat time as of the essence unless there is some express term in the contract so providing. 13 C. J. 686. . . ."

However, they contend that, under the evidence, Sladky comes within the qualifications stated by this court in the next sentence after the foregoing quotation; and subsequently stated in *Buntrock v. Hoffman,* 178 Wis. 5, 13, 189 N. W. 572, in the following manner:

"In the absence of express language making time of the essence of the contract it is sometimes difficult to determine whether it was the intention of the parties to make time of the essence or not; it then oftentimes becomes necessary to consider the surrounding facts and circumstances, the situation of the parties, and the acts of the parties with respect to the subject matter. Each case must be decided upon its own circumstances. Although time is originally of the essence of the contract, a strict performance may be waived. 'The subsequent conduct of the parties may also amount to a con-

struction by them of the original contract, and show that they understood and regarded that time was, or was not, of its essence.' 39 Cyc. 1341, 1342, and cases there cited."

In support of that contention, it is claimed that the fact that time was of the essence of the contract is proven by evidence to the effect that the plaintiffs knew that, because Sladky's mother was very ill, it was his intention to get her off the farm as soon as he could obtain someone else to take it over; that, therefore, immediately after the contract was signed, the abstracts were posted and delivered to the attorneys on July 9th, and the plaintiffs, in anticipation that the deal would be closed in the course of a few days after the examination of the abstracts, had moved five truckloads of their personal property to the farm on July 9th and 10th at Sladky's request, and he, to make room therefor, had temporarily moved some of his household effects to the city property with the intention of taking them to his Geneva street house, which was being vacated for occupancy by him and his mother and sister; that Gilday, by July 11th, had informed Sladky and Nelson that there were defects in plaintiffs' title and Sladky told the plaintiffs that night to "hold off" because of such defects; that Sladky on July 19th, upon being advised by Gilday that the plaintiffs could not deliver good merchantable title within the time contemplated by the parties in closing the deal, had decided to rescind the contract because he could not wait very long; that he did wait until July 27th, and, upon the failure of plaintiffs' attorneys to attempt to cure the defects by that date, he rescinded the contract; that, upon realizing that the plaintiffs could not complete the transaction within the time anticipated by him, Sladky decided to obtain someone else to take over the farm, and advertised the sale or rental thereof on July 23d; that he leased it to the defendant, Smerda, on August 10th, and moved with his mother and sister to the Geneva street house.

However, in respect to those matters, the court found that "Sladky within a few days after the agreement had been signed and prior to the receipt of the written opinion of Mr. Gilday had decided to breach the agreement and not go through with the deal and refused at all times thereafter to discuss the matter with plaintiffs or their attorneys or to enter into any negotiation for the correction of any supposed defects in the title to the plaintiffs' premises;" and that the conduct of Sladky, "in refusing to complete the contract was arbitrary and the reasons given by him for rescinding the agreement were not well founded and his rescission of the agreement was for reasons other than those assigned by him and that although the plaintiffs offered to clear off any fancied defects or clouds upon the title the defendant Sladky arbitrarily refused to wait for that to be done or to consummate the agreement executed by him." Those findings were warranted by such facts as that, as early as July 11th, Sladky told the plaintiffs to "hold off," and abruptly terminated the deal and refused to speak to them thereafter, although he had then only been told by his attorney, Gilday, that he had but glanced at plaintiffs' abstract, and that there was a "shadow" on their title. At that time his Geneva street home was not even vacant and ready for his occupancy, and his refusal to co-operate with plaintiffs until they had at least been informed of the nature of alleged imperfections, and been accorded a reasonable opportunity to remedy them, demonstrate that the time of his removal from the farm was not entirely dependent upon complete performance of the contract of sale. On the contrary, as was found by the court, Sladky had evidently definitely decided to move to his Geneva street house as soon as it was made available for his occupancy, regardless of whether his farm was sold, or the time of complete performance of a contract for the sale thereof. At all events, the facts warranted the court's conclusion that "time was not of the essence of the contract."

That being true, in as much as Sladky had arbitrarily and without any well-founded reason for his rescission, refused to perform his contract without waiting for plaintiffs to clear the alleged imperfections in the title and consummate their contract, as they offered and were ready and able to do, the court could, in connection with granting specific performance, in the exercise of its sound discretion in accordance with settled equitable principles, permit the plaintiffs to perfect their title of record at any time up to the entry of a final judgment, under the rule stated in Pomeroy, Spec. Perf. (3d ed.) § 421, as follows:

"If the delay arises from a defect in his title, which the vendor finally cures, or from a difficulty in making the title good—such as the vendee has a right to demand—for example, in obtaining proper evidence, clearing off incumbrances, getting in outstanding estates, and the like; and time is not an essential element of the contract, either from express stipulation, or from the nature of the subject matter or object of the agreement—then the delay thus occasioned, or the lapse of time while the vendor is engaged in making his title good, will not prevent him from obtaining a decree of specific performance against the purchaser. The doctrines of the equity courts are satisfied if the vendor is able to procure and give a good title *at the time of the decree* even though he could not do so at the time of commencing his suit."

This court said, in *Gates v. Parmly,* 93 Wis. 294, 315, 66 N. W. 253, 67 N. W. 739:

"The objection that the abstract tendered at the trial, which shows that the objection of want of title to many of the tracts conveyed to Parmly, trustee, had been removed, was not in time, is untenable. It is not claimed in this case that time was made, by express stipulation or otherwise, of the essence of the contract; and in such a case, if the vendor is unable to show good title at the commencement of his suit, it is sufficient if he perfects it before the final hearing or the report on title by the master or referee. Pomeroy, Spec. Perf. § 376, and cases cited; Beach, Mod. Eq. Jur. § 612.

Inasmuch as no such inquiry was directed here, it seems to be within the spirit of the rule to allow the abstract to be tendered at the trial, and the delay will be held immaterial, except upon the question of interest, if the vendor can make out his title at the time of the decree. *Jenkins v. Fahey,* 73 N. Y. 355; *Pierce v. Nichols,* 1 Paige (N. Y.), 244; *Brown v. Haff,* 5 Paige (N. Y.), 235."

See also *Maryland Construction Co. v. Kuper,* 90 Md. 529, 45 Atl. 197; *Louis K. Liggett Co. v. Rose,* 152 Md. 146, 136 Atl. 651; *Reformed Protestant Dutch Church v. Mott,* 7 Paige (N. Y.), 77, 85; *McKevitt v. Sacramento,* 55 Cal. App. 117, 203 Pac. 132; *McNally v. Palmer* (N. J. Ch.), 100 Atl. 335; *Oakey v. Cook,* 41 N. J. Eq. 350, 7 Atl. 495; *Van Riper v. Wickersham,* 77 N. J. Eq. 232, 76 Atl. 1020, 30 L. R. A. (N. S.) 25; *Buckhorn Coal & Lumber Co. v. Lewis,* 232 Ky. 415, 23 S. W. (2d) 596; *Woodman v. Blue Grass Land Co.* 125 Wis. 489, 497, 103 N. W. 236, 104 N. W. 920; and *Douglass v. Ransom,* 205 Wis. 439, 237 N. W. 260.

In view of Sladky's arbitrary refusal on July 11, 1934, to confer with the plaintiffs and allow them a reasonable opportunity to perfect their title, they were not required, under the facts and circumstances in this case, to take further steps to remove the alleged imperfections, until there was an interlocutory adjudication that they were entitled to specific performance upon the removal thereof. As was said in *Maryland Construction Co. v. Kuper, supra* (p. 199), in justification of the rule granting relief to a vendor if he is ready to furnish a clear title at the time of the final decree:

". . . If this were not so, an owner of land who had incumbrances upon it might pay them off for the purpose of giving the purchaser a clear title and then not be able to enforce the contract of purchase, or he might be subjected to heavy costs in order to have his title cleared and then not be able to require the purchaser to perform his part of the contract. . . ."

The court did not expressly determine whether plaintiffs' abstract of title showed good and merchantable title in the plaintiffs when it was submitted to Gilday on July 9, 1934. Failure in that respect would not defeat their right to performance, in as much as time had not been made of the essence of the contract, and they were, therefore, entitled to a reasonable opportunity to remove imperfections in title that could be remedied. However, the court did find that, "at the time of the trial the plaintiffs had the abstract of title posted from the original patent from the government down to the plat; had had all mortgages prior to the year 1900 shown upon the abstract, together with their respective satisfactions." Those findings were in accordance with the evidence, and, in view of the facts thus found, there remained no basis for the first and second objections which were stated in Gilday's letter. The court's fourth conclusion of law was: "That the abstract of title tendered by the plaintiffs at the trial of said action of the plaintiffs' premises referred to in the agreement of July 7, 1934, showed a good and merchantable title in the plaintiffs of said premises." That conclusion was clearly proper in so far as the first, second, and third objections by Gilday were concerned. The latter related to certain tax deeds from the city of Racine to Charles J. F. Schroudenbach, in the years 1872 and 1873, and was evidently made without due consideration of the fact that in 1872 and 1873, as well as subsequent thereto, the statutes provided that such deeds or a certified copy of the record thereof constituted at least *prima facie* evidence of an absolute title in fee simple in the grantee therein named to the land therein described. Taylor's Stats. 1871, ch. XVIII, § 178. At times the presumption was even declared to be conclusive. See sec. 1188, R. S. 1878; sec. 75.14, Stats. 1933. Under those statutes a tax deed, fair upon its face, is at least *prima facie* a marketable title unless some irregularity, rendering it unmarketable,

is shown. Thus, in *Gates v. Parmly, supra,* p. 315, the court said:

". . . The only decision we have met with upon the question whether a tax title is a marketable one where the deed is *prima facie* evidence of title in fee simple and of the regularity of the proceedings up to and including the execution of the deed, is in *Kramer v. Ricke,* 70 Iowa, 535, where it was held that such a deed was a title that would enable the vendor, upon objection to the title, to recover the purchase money, and that it was for the vendee to point out and sustain objections. After much doubt and hesitation, we have concluded that a tax deed, under our statute, fair upon its face, is *prima facie* a marketable title, which the vendee is bound to accept as such, unless specific objection is made and at the hearing, or upon the usual inquiry or reference as to the state of the title, it is found not free from reasonable doubt."

See also *Hart v. Smith,* 44 Wis. 213, 229; *Bemis v. Weege,* 67 Wis. 435, 30 N. W. 938; *Emerson v. McDonnell,* 129 Wis. 67, 107 N. W. 1037; *Allen v. Allen,* 114 Wis. 615, 91 N. W. 218; *Baker L. & T. Co. v. Bayfield County L. Co.* 162 Wis. 471, 156 N. W. 459.

Gilday's fourth, fifth, and sixth objections relate to deeds dated in the years from 1874 to 1899. During those years the title was conveyed by a deed executed on February 19, 1874, by Charles J. F. Schroudenbach, a Catholic priest, to John Martin DeHenni, Catholic bishop of Milwaukee and his successor in office, in trust for the exclusive use and benefit of the Roman Catholic St. Patrick's church in Racine. That deed was given before the incorporation of that church was authorized by ch. 37, Laws of 1883; but, under that enactment, it was incorporated in 1883, under the name of "St. Patrick's Congregation." On May 27, 1883, Rev. Schroudenbach executed a quitclaim deed to Michael Heiss, archbishop of Milwaukee and his successor in office, to render of no effect whatever the conditions imposed by his deed

of February 19, 1874; however, in describing the property, the lot numbers were mentioned but the block number was omitted. On June 16, 1884, Archbishop Heiss, as trustee, deeded the property to the St. Patrick's congregation; and, on November 28, 1899, the latter conveyed to Mary McCarroll (plaintiffs' predecessor in title), but the apostrophe and the letter "s" were omitted from the word St. Patrick's in the grantor's corporate name. Those deeds were objected to on the grounds, (1) that there was no wife's signature to Rev. Schroudenbach's deeds and no recorded showing that he had no wife; (2) that, because the block number was omitted in his quitclaim deed of May 27, 1883, it was ineffective to remove the condition in his deed of February 19, 1874; (3) that there was no recorded showing that the archbishop, Michael Heiss, was the successor in office to Bishop John Martin DeHenni; and (4) that there was nothing on record as to the identity of St. Patrick's congregation, and that the difference in respect to its name by reason of the omission of the apostrophe and the letter "s" from the word "St. Patrick's" in its deed to Mary McCarroll should be cleared up.

The trial court said that those objections are "technical, inconsequential and do not render the title unmerchantable." That conclusion was evidently based on the proposition that, in order to render a title unmerchantable, alleged defects must be such as "will cause a reasonable doubt and just apprehension in the mind of a reasonably prudent and intelligent person, acting upon competent legal advice, and prompt him to refuse to accept" a title. *Douglass v. Ransom, supra,* p. 446. However, if there was occasion for such doubt or apprehension in any of those respects, Sladky was fully protected by the proviso in the interlocutory judgment giving him the right, if he desired, to have the plaintiffs, by recorded proof, entirely remove whatever basis there was for

such doubt or apprehension; and there certainly remained no basis therefor, when the plaintiffs, on their own motion, duly established in court that they had recorded proper proof by a court order made under sec. 235.65, Stats., and affidavits recorded under sec. 235.46, Stats., that all of the alleged imperfections in the title, as recorded, had been duly remedied. That evidence fully warranted the court's supplemental adjudication on July 12, 1935, finding that the affidavits and an order remedying those imperfections had been duly recorded. As plaintiffs' title, as then of record, was merchantable, without room for any doubt whatsoever, and plaintiffs were then certainly entitled to specific performance as theretofore adjudged, the court rightly denied Sladky's motion for the annulment of the judgment and a reconsideration of the case.

It is also contended that performance by Sladky had become impossible and could not be enforced in equity because, after his attempted rescission on July 28, 1934, he had entered into a *bona fide* lease with the defendant, Smerda, for a period of three years with an option to the latter to purchase the farm. On that subject the court's adjudication was: "That any rights that the defendant, Anton Smerda, may have in said premises by virtue of the lease to him, or otherwise, are subject and subordinate to the rights of the plaintiffs." That conclusion was warranted by credible evidence to the effect that Sladky told Smerda about the deal with the plaintiffs before he leased to Smerda. It may also be deemed of some significance that Sladky reserved the option in the lease to terminate it if the premises were sold during the term thereof. As Smerda was chargeable with knowledge of plaintiffs' prior contract, and their equities in the farm by reason thereof, the court rightly concluded that his leasehold was subject to their rights. (*Webb v. Mason,* 152 Wis. 19, 23, 139 N. W. 442.) Under those circumstances, there was

no such impossibility of performance by Sladky as rendered it impossible, or even inequitable, to decree specific performance.

*By the Court.*—The judgment entered on May 11, 1935, and the supplemental order entered on July 12, 1935, are affirmed.